## THE NEW LONDON.

## THE EGERTON.

(District Court, E. D. New York. October 19, 1918.)

COLLISION ⊂⊃82(2)—STEAM VESSELS IN FOG—EXCESSIVE SPEED.

A steamer, which was out of her course in Long Island Sound in a fog. *held* solely in fault for a collision with a tug and her tow, on the ground that she was running at excessive speed.

In Admiralty. Suit for collision by the Egerton Towing Company against the steamer New London, with cross-libel by the Central Vermont Transportation Company against the steam tug Egerton. Decree for libelant.

Foley & Martin, of New York City (W. J. Martin, of New York City, of counsel), for Egerton Towing Co.

Haight, Sandford & Smith, of New York City (Henry M. Hewitt, of New York City, of counsel), for the New London.

CHATFIELD, District Judge. On the morning of September 9, 1915, the New London, a steamer 270 feet long, struck the Egerton, a tug 73 feet long, somewhat aft of amidships on the starboard side. The New London ground along, with her guard and the supports breaking down the house of the Egerton, until the New London and the Egerton were clear. Then the New London, backing, but at the same time apparently still having way, came in contact with the barges in tow of the Egerton, which were on a short hawser of 10 or 15 fathoms, and by the backing of the New London's engines these scows swung around to the other side of the New London and got in difficulties under the guard, from which the force of extricating one of the scows broke the windlass attachments of the New London.

According to the testimony, the New London gave a signal to reverse just before striking the Egerton, and the Egerton, which just before collision had stopped her engines and had then not much way, gave a signal to go ahead, so as to throw her stern out of the reach of the New London, and then again stopped, but by so doing she obtained headway enough to help in actually passing the New London.

There is one point of difference between the witnesses, in that the Egerton's witnesses testify that the New London struck nearly head on, and by so doing they place the Egerton more nearly across the course of the New London. This must be taken into account in considering the testimony that the New London was over close to the Old Hen buoy and the Sands Point shore, for a boat of her length could not have been coming on a course straight out, so as to strike the Egerton at this angle, unless she had been substantially on shore just before. It is apparent from the testimony that the New London had been running on a course from Captain's Island. She had held this course, which was S. W. by W. ½ W., for over 45 minutes. This should have brought her to a point where the siren on Execution Rocks would be

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

heard, and she should pass this siren about a quarter of a mile to the south.

After the collision, and when the fog lifted, the New London (which had anchored) and the Egerton were actually about one-quarter of a mile further to the south, and not far from the Sands Point buoy. The witnesses differ somewhat as to just how far to the north and east of this buoy the boats were at the time; but it seems to be quite apparent that, if the New London had not anchored at this spot, they would have drifted onto the buoy, and they were then very close to it, and very nearly on a line between Sands Point and the Old Hen buoy.

The examination of a large chart showing this compass course from Captain's Island to Execution Rocks makes it also plain that the Edgerton, in following her course from the Gangway buoy to the Sands Point buoy, would be more or less on a parallel course to that of the Sound steamers, and less than a quarter of a mile to the south. It is also settled by the testimony that the Egerton did pass the Sands Point buoy at a short distance, not more than 100 feet, on her starboard. She then took a course which should have brought her about the same distance north of the Old Hen buoy, and the issue on the testimony of the witnesses in the case is whether the Egerton pursued this course, or whether in some way she deviated to the north, so as to meet the New London, which was somewhat to the south of her compass course. In fact, the captain of the New London says she was a little south of where she should have been. The New London claims she had not changed her wheel, and had been following a compass course ever since she ran into the fog. She had been running under one bell for some minutes after the fog shut in, and had been moving in the beginning of the flood tide since something like half past 5, when the tide turned, at the point where she then was further to the east. It seems to be apparent that the effect of the tide, which sets to the westward and to the south, would carry the New London to the south of her course, unless allowance were made therefor, and that this allowance was customarily made by moving the helm so as to hold true, on the range as well as on the course, until Execution Rock and the horn thereon were located; but, if there was an excess drift to the south in the fog, and no allowance made therefor, the New London would be nearly to the Old Hen buoy.

The issue, therefore, is one of fact. The New London was off her course, and seems to have been hunting for the horn on Execution Rock, when the Egerton was heard close at hand. Both boats were sounding fog signals, but the New London had not stopped when doubt as to her course and position became apparent. In fact, she did not reverse until close to the Egerton.

The New London had run some time longer than usual before getting opposite Execution Rock, and this is explained by the longer course which she must have followed, and by her reduced speed after the fog shut down. She was therefore lost in the fog, and should have navigated accordingly. Instead of so doing, she proceeded as if she had heard the Execution Rock horn, and the libelant claims that she had changed her course to run past Gangway Rocks. The horn was

never heard on the New London, and the evidence does not justify a finding that the collision was far enough to the eastward to explain that fact. On the contrary, the tide had not changed long before the collision at this point and the New London anchored soon after the collision. Thus the boats could not have drifted far to the west, and the witness who rowed out in a boat from the Old Hen buoy went in the direction of Sands Point buoy for 10 or 15 minutes. This witness started about 7:30, when he heard a crash in the fog, and his testimony corroborates that of the master of the Sagamore, who passed before 7:35 a boat close on his starboard hand, and, as he recollects, within 100 feet or so east of the Sands Point buoy. He heard nothing of the collision, and his attention was not called to the matter until he saw the Egerton later in the day. But his testimony is definite enough to. locate the Egerton near the Sands Point buoy and to fix the approximate time of collision as later than that given by the New London.

On the other hand, the Egerton had proceeded some 8 minutes from the Sands Point buoy. She ordinarily took 15 minutes to run to the Old Hen buoy, and had been running 5 minutes under one bell after passing the Sagamore. This would bring the Egerton well over toward the Old Hen buoy, and considerably to the east of the point where the boats were anchored when the fog lifted. Thus, in accord with all the other testimony, the Egerton must have been further east than the point marked by her captain on the chart, and she may, in passing the Sagamore, have changed her course, so as to be further to the north than her usual path. She was on a compass course N. E. ½ E., and could not have been out in the ordinary path of the New London.

It will be found, therefore, that the New London was out of her course, and in a position where she should not have proceeded as if her location had been clearly ascertained. She approached the Egerton at a speed which, even if the Egerton was then to the north of her usual course, made the New London the burdened vessel, and did not stop, when moving with the flood tide, until collision was inevitable. The Egerton was moving against the tide, and was evidently going slowly until hooked up to avoid collision, and was sounding fog signals which should have warned the New London, if that boat had realized her position.

Fault must therefore be placed upon the New London, and the libelant may have a decree.